**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-cr-215 (RC)** |
| **WILLIAM LEWIS,** | |
| **Defendant.** | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence William Lewis to 57 months of incarceration, at the mid-point of the advisory guideline range of 51 to 63 months, 36 months of supervised release, $3,716 in restitution, and the mandatory special assessment of $100.

## I.      INTRODUCTION

The defendant, William Lewis ("Lewis"), participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]   Lewis was a ready, willing, and determined participant in the chaos that gripped the

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Capitol on January 6.

Lewis drove with two friends from Burbank, Illinois to Washington, D.C. to attend the protests at the Capitol.   After attending a rally, Lewis marched to the Capitol.   Once at the Capitol, Lewis made his way to the defensive police line of officers struggling to prevent the mob from advancing to the Capitol building itself.   Lewis exacerbated the plight of the police officers by spraying them on four different occasions with Wasp and Hornet Killer.   But Lewis's violent conduct wasn't finished.   When police lines collapsed, he ascended to the Lower West Terrace of the Capitol building.   He helped further the illegal objectives of the mob by attacking a large, composite window to the right of the Lower West Terrace tunnel.   Wearing protective gloves and a backpack garnished with a small American flag, he viciously and repeatedly struck four panes of the window with a stolen police baton until he had shattered 3 of them.   The United States recommends that the Court sentence William Lewis to 57 months of incarceration for his violation of 18 U.S.C. § 111(a)(1).   A 57-month sentence reflects the gravity of Lewis's conduct and the need for general and specific deterrence.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The United States refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 29, for a short summary of the January 6, 2021 attack on the United States Capitol by thousands of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.      William Lewis' Assaultive Conduct at the Capitol**

On January 4 , 2021, Lewis and two friends drove from Burbank, Illinois to the greater Washington, D.C. area.[2]   The purpose of his trip was to participate in the protests at the Capitol. Upon arrival, Lewis and his friends met up with two other friends and stayed the night at a house belonging to one of them.[3]   *See* Image 1 (below).   The men hung out together the next day, and Lewis slept the night of the January 5 in the vehicle in which he traveled, parked near the Capitol. The next day, all five men went to the Capitol and were present for the riot.



*Image 1 –Lewis (framed in red) and Gober (framed in green) on the West Plaza prior to the assaults[4]*

---

[2]   One of the friends was an old Army buddy of Lewis's.   Neither of the individuals has been charged.

[3]   One of these friends, Billy Jo Gober, has been charged with violations of 18 U.S.C. §§ 231(a)(3), 111(a)(1), 1752(a)(1), 1752(a)(2), and 1752(a)(4), as well as violations of 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(F) in connection with his conduct during the riot on January 6. (Case No. 24-cr-20-RBW)   That case is scheduled for trial.   The other friend has not been charged.

[4]   Image 1 is a screen capture from a publicly available Breitbart video at :42.

After attending the "Stop the Steal Rally" at the ellipse, Lewis made his way to the West Plaza, which was, by that time, overrun with rioters. United States Capitol Police (USCP) and Metropolitan Police Department (MPD) officers were struggling to maintain lines of defense and trying to prevent rioters from advancing further to the Capitol building itself. Lewis positioned himself of the south side of the West Plaza, near a scaffolding that had been erected over a set of stairs leading to a higher level of the Capitol building (the "Southwest Scaffold"). Over the course of twenty-four minutes, Lewis deployed chemical spray at officers on four separate occasions. All of the spray assaults took place at locations in the vicinity of the Southwest Scaffold. *See* Image 2 (below).



*Image 2 – Diagram showing location of assaults on west front of the Capitol*

1. First Assault – 2:12 p.m.

At Location No. 1, MPD Officers K.H., H.F., Sgt. B.B., M.V., S. C.-B., Sgt. M.K., along with USCP Officer S.L. and Lt. V.P, were part of a defensive police line at the top of a short flight of stone steps. Exhibit 1. A huge crowd was densely gathered at the bottom, and rioters were

attempting to charge up the steps, individually and in small groups.   Exhibit 2; *See* Images 3, 4 (below).   It was pandemonium.



*Image 3 – rioters charging up short flight of steps; officers visible at top of steps at right[5]*

---

[5] Image 3 is a screen capture from Exhibit 2, the BWC recording of Officer K.H., at 14:12:02.



*Image 4 –rioters charging up steps at right; officer at top of steps in foreground at left; Lewis (framed in red) with hand extended;*[6]

Lewis was about 15-20 feet away from the clashes occurring there.    He had in his possession a spray can of No-Pest Wasp and Hornet Killer.    *See* Images 5, 6, 7 (below).

---

[6] Image 4 is a screen capture from the BWC recording of Sgt. M.K. at 14:12:07.



*Image 5 – Lewis concealing spray can (circled in orange) inside black jacket[7]*

---

[7] Image 5 is a cropped screen capture from Exhibit 3, which is a publicly available video from The Convo Couch.

 

*Image 6 (left) - can of spray in Lewis's hand; and Image 7 (right) - retail image of can)[8]*

At approximately 2:12 p.m., Lewis stretched his right arm up and above the heads of the rioters in front and around him, and deployed streams of spray at an elevated angle toward the officers clustered at the top of the steps.   Exhibit 1; *See* Images 8, 9, and 10 (below).   He deployed the spray at least three times over the course of about 10 seconds.

---

[8]  Image 6 is an inset of a screen capture from Exhibit 3, which is a publicly available video from Convo Couch, at :07; and Image 7 was obtained from Google Images.   The description on the can boasts a capability of a 20-foot spray.



*Image 8 – Lewis (outlined in red) extending his hand and arcing stream (indicated by blue arrow) so as to reach officers at top of steps*[9]

---

[9] Image 8 is a screen capture from the BWC recording of Officer S. C.-B. at 14:12:01.



*Image 9 (above) and Image 10 (below) – Lewis's elevated, gloved hand (outlined in orange) deploying stream toward officers (as shown by blue arrow)[10]*

---

[10]  Image 9 is a screen capture from Exhibit 1, a publicly available video from Benjamin Reports, at 00:00.   Image 10 is a is a screen capture from a publicly available Breitbart video at 01:39 which shows Lewis from behind.   It is possible to see the furled miniature American flag that is tucked in his backpack.



The streams of spray ultimately aerosolized as white foam.  A multitude of white foam droplets can be seen flying through the air, landing on, and sticking to the face shields, helmets, jackets, and pantlegs of the officers.  *See* Images 11, 12, 13, 14, and 15 (below).



*Image 11 – spray droplets (shown by blue arrow) flying toward Officer S. C.-B., whose BWC is recording; Lewis circled in red [11]*

---

[11] Image 11 is a screen capture from the BWC recording of Officer S. C.-B. at 14:12:01.



*Image 12 – spray (shown by blue arrow) flying toward Officer M.V., whose BWC is recording, and other officers in the police line[12]*



*Image 13 – stream (shown by blue arrows) hitting Officer K.H. (behind large red hat) [13]*

---

[12] Image 12 is a screen capture from the BWC recording of Sgt. M.K at 14:12:05.

[13] Image 13 is a screen capture from Exhibit 1, a publicly available video from Benjamin Reports, at 00:02.



*Image 14 – White spray droplets sticking to Officers M.V., Sgt. B.B., and S.L.; and M.K.; and Lt.*
*V.P.; Sgt. B.B. (circled in yellow) turning after having been sprayed in the face.* [14]



*Image 15 – White spray droplets flying toward and covering officer at top of steps* [15]

---

[14] Image 14 is a screen capture from Exhibit 1, a publicly available video from Benjamin Reports, at :08.
[15] Image 15 is a screen capture from the BWC recording of Officer H.F. at 14:15:06.

As a result of the effects of the spray, MPD Officers Sgt. B.B., K.H, and M.V., as well as USCP Officer S.L., had to remove themselves from the line and seek treatment for their eyes. *See* Images 16 and 17 (below).



*Image 16 (above) – Officer K.H. (left), who is himself struggling with effects of Lewis's spray, pours water in Officer M.V.'s eyes; Image 17 (below) – Officer M.V. about to receive water*[16]



---

[16] Image 16 is a screen capture from the BWC recording of Officer M.V. at 14:15:06 and Image 17 is a screen capture from Exhibit 2, the BWC recording of Officer K.H., at 14:15:18.

2. Second Assault – 2:21 p.m.

At approximately 2:21 p.p., at Location No. 2, Lewis sprayed streams of wasp and hornet spray at police officers, including MPD Officers S.N. and D.T.   *See* Images 18 and 19 (below). Lewis raised his hand high and elevated the angle of the spray stream so as to be able to clear the rioters in between himself and the officers.



*Image 18 – Lewis (framed in red) elevating gloveless hand above crowd and pointing spray can*[17]

---

[17] Image 10 is a is a screen capture from a publicly available Breitbart video at 01:39.



*Image 19 – spray droplets (indicated by blue arrow) flying toward Officer D.T (indicated by yellow arrow).*[18]

As a result of being hit with the spray, at least Officer S.N. was forced to immediately remove himself from the defensive line and seek treatment for his eyes.   *See* Image 20 (below).

---

[18] Image 19 is a screen capture from the BWC recording of Officer D.T. at 14:21:20.



*Image 20 – Officer S.N. (framed in yellow) turning, running to seek treatment for his eyes after being sprayed by Lewis[19]*

3.  Third Assault – 2:23 p.m.

At approximately 2:23 p.m., at Location No. 3, Lewis sprayed streams of wasp and hornet spray at MPD Officer J.G.   Exhibit 4; *See* Images 21, 22, and 23 (below).   The deployment of spray was direct and close.

---

[19] Image 20 is a screen capture from the BWC recording of Officer D.T. at 14:12:29.



*Image 21 – Lewis (framed in red) pointing spray can directly at Officer J.G., whose BWC is recording*[20]

---

[20] Image 21 is a screen capture from the BWC recording of Officer J.G. at 14:23:23.



*Image 22 – spray flying (shown by blue arrow) toward Officer J.G.[21]*

Officer J.G. was forced to leave the line of service to seek treatment for his eyes.   Exhibit 5; *See*

Image 24 (below).   He reported experiencing a burning sensation on his face and in his eyes.

---

[21] Image 21 is a screen capture from the BWC recording of Officer J.G. at 14:23:23.



*Image 23 – Lewis (framed in red) deploying stream (as shown by blue arrow in expanded inset) toward officers in police line (indicated by yellow line)[22]*

---

[22] Image 23 is a screen capture from Exhibit 5, which is exterior Capitol surveillance video, at 2:23:25 p.m. (00:23 in the run time).



*Image 24 – Officer J.G. (framed in yellow) turning, running to seek treatment for his eyes after being sprayed by Lewis*[23]

4.  Fourth Assault – 2:36 p.m.

Despite having sprayed officers on three occasions, Lewis still wasn't finished.    At approximately 2:36 p.m., about 13 minutes after spray assault number three, he deployed spray at officers twice more at Location No. 4.    Exhibit 3; *See* Images 25, 26, and 27 (below).    He extended his hand up above the heads of other rioters and angled the spray stream so as to be able to reach the

---

[23] Image 24 is a screen capture from Exhibit 5, which is exterior Capitol surveillance video, at 2:23:25 p.m. (00:24 in the run time).

officers in the distance.



*Image 25 – Lewis (outlined in red) pointing can (circled in orange) at officers (circled in yellow)[24]*



*Image 26 – Lewis (outlined in red) reaching above crowd and deploying spray stream at elevated angle (as shown by blue arrow) toward white-helmeted officers (circled in yellow)*

---

[24] Image 25, Image 26, Image 27, Image 28, Image 29, and Image 30 are screen captures from Exhibit 3, a publicly available video from The Convo Couch, at 00:07–:20.



*Image 27 – Lewis (outlined in red) reaching above crowd and deploying stream at elevated angle (as shown by blue arrow) toward white-helmeted officers (circled in yellow)*

In the process of these various deployments, Lewis depleted his spray can. Upon realizing that spray was no longer coming out of the can, he threw it at the officers. *See* Images 28, 29, and 30 (below).



*Image 28 – Aerosol mist (as outlined in blue) emitting from depleted spray can*



*Image 29 – Lewis winding up to throw spray can (circled in orange)*



*Image 30 – Can (circled in orange) flying toward officers after release by Lewis (circled in red)*

Thereafter, Lewis ascended to the Lower West Terrace of the Capitol building.   He made his way through the dense crowd to the large composite window to the right (south) of the Lower West Terrace tunnel.   He watched the violence taking place at the mouth of the tunnel.   *See* Image 31 (below).



*Image 31 – Lewis (circled in red) watching other rioters attack officers at the entrance to the Lower West Terrace tunnel (indicated by yellow arrow),with still-intact window visible[25]*

He then turned his attention to the composite window immediately to the right of the tunnel. At that location, using a police baton, he smashed three different panes (one quarter-moon, and two smaller square panes).   Exhibits 6, 7, and 8; *See* Images 32, 33, and 34 (below).   He initially attacked the left quarter-moon pane several times, shattering it.

---

[25]  Image 31 is a publicly available photo.



*Image 32 – Lewis (framed in red) attacking left quarter-moon pane with police baton[26]*

Then he shifted his focus to the smaller rectangular panes beneath it.   This may have been because the striking angle was better, and he didn't have to reach as far.   Lewis appears to have been the first rioter to attack this window.

---

[26] Image 32 is a publicly available photo.



*Image 33 – Lewis (circled in red) holding baton with black and white glove, attacking panes of composite window, as seen from balustrade above [27]*



Image 34 – Lewis about to strike intact right quarter moon pane. [28]

---

[27] Image 33 is a screen capture from EXHIBIT 6, a publicly available USA Sight video, at 00:10.

[28] Image 34 is a screen capture from EXHIBIT 8, a publicly available YouTube video entitled,



*Image 35 – Lewis attacking 2 lower square panes with police baton*[29]

Images show Lewis wearing heavy-duty, black and white gloves, which were later found during a

search of his residence.   A U.S. Army patch is visible on the left sleeve of his black jacket.

---

"ANTIFA BLM at the Capitol Washington DC protests RAW - Daniel Swier," at 00:05.

[29] Image 35 is a publicly available Reuters photo.



*Image 36 – Lewis, standing close to window, wearing heavy-duty black and white gloves, and holding police baton[30]*

---

[30] Image 36 is a screen capture from Exhibit 7, a Parler video which was publicly available on Twitter.



*Image 37 – Lewis without face covering[31]*

F.B.I. Agents conducted a search of Lewis's residence on November 9, 2023.   They found Lewis's phone, but they had to move his bedside table and bed in order to retrieve it.   During the search, Agents found a pair of heavy-duty, Husky brand, black and white gloves which match those that Lewis can been seen wearing in various videos and photos.

---

[31] Image 37 is a publicly available photo.

### C.    William Lewis's Post-January 6 Statements

Lewis felt no remorse for his participation in the violence at the Capitol.

He submitted to a voluntary interview on the day of his arrest.    He told Agents that he had gone to the Capitol "to show support" for Donald Trump.    He said that he had traveled with a "combat buddy."    Lewis said that he believed the 2020 presidential election to have been "stolen" (and was still of that belief at the time of the interview).    He had hoped that his presence at the Capitol would "encourage" Congress not to certify the electoral vote.    He had hoped they would ask for a recount.    He denied bringing any spray to the riot.

In regard to his experience at the riot, he admitted having seen other people "pulling on the railings," and that he "got gassed."    He recalled seeing individuals dressed in paramilitary garb. He recalled seeing people standing on the scaffolding but said that he thought they were allowed to be there.    He said that he saw officers "go on the offensive," spraying people with "bear spray" from long distances and "conking people on the head."    He admitted to using spray but said that he never intended to spray any officers.    He said he wanted to help the police.    He explained that he was spraying other rioters to neutralize the effects of pepper spray that officers had sprayed in trying to quell the riot.

Lewis admitted taking the police baton but said that he "threw it away" after January 6.    He volunteered that he wished he had kept it.    He identified himself in a picture in which he is holding the can of wasp and hornet spray, but he denied seeing any wasp spray.

When Agents showed him a picture of himself at the window, he declined to answer any more questions, and the interview ended.

Later, in August of 2024, Lewis submitted to a debrief interview as required under the terms of his Plea Agreement.    Lewis explained how he had traveled from Burbank with friends and met up with other friends in the D.C. area before going all together to the Capitol.    Lewis shared a bond

of prior military service with all of these individuals.   Lewis again told Agents that he wasn't spraying *at* the police.   This time, however, he claimed that he was directing his spray at other rioters who were spraying the police.[32]   This is contrary to what the videos show.   As for the attack on the window, Lewis said he went into "military mode."   He recalled that, while he was striking the window, the crowd started chanting, "ANTIFA".   When he heard a guy say, "What the fuck are you doing!?" and realized they were accusing *him* of being affiliated with ANTIFA, he stopped striking the windowpanes.

***Injuries***

Lewis sprayed numerous officers.   Videos show that several of the victim officers recoiled and immediately left the police line to seek treatment.   At least one of the officers who was hit directly in the face, M.P.D. Officer J.G., recalled the experience.   Officer J.G. recalled a burning sensation in his eyes and on his face after he was sprayed.

Officer J.G. had to leave the police line to flush his eyes out with water, which required the assistance of another officer.   At this point, the government is aware of least 3 other officers (S.N, K.H., and M.V.) who were forced to do the same.

## III.    THE CHARGES AND PLEA AGREEMENT

On May 8, 2024, the United States Attorney filed an Information charging Lewis with one count of Assaulting, Resisting, or Impeding Certain Officers (18 U.S.C. §111(a)(1)).   (ECF No. 26)   On June 3, 2024, Lewis pleaded guilty as charged pursuant to a written plea agreement.   (ECF No. 28)

## IV.    STATUTORY PENALTIES

Lewis now faces sentencing on one Count of Assaulting, Resisting, or Impeding Certain

---

[32] Lewis said that he loves the police.

35

Officers in violation of 18 U.S.C. §111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   As the parties agreed in the Plea Agreement, and as the Probation Office also agrees, the Guidelines analysis for this matter is as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.2(a)) | 14 |
| Use of Dangerous Weapon (U.S.S.G. § 2A2.2(b)(2)(B)) (spray) | + 4 |
| Official Victim (U.S.S.G. § 3A1.2(b)) | + 6 |
| Bodily Injury  (U.S.S.G. § 2A2.2(b)(3)(A)) | + 3 |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | - 3 |
| **Total Adjusted Offense Level:** | **24** |

*See* Plea Agreement ¶ 5(A).

The parties agreed, and the PSR reflects, that Lewis is not eligible for the zero-point offender adjustment under U.S.S.G. § 4C1.1(a) because Lewis used violence in connection with the offense. See U.S.S.G. § 4C1.1(a)(3).   Plea Agreement ¶ 5.C; P.S.R. ¶ 47.

The U.S. Probation Office calculated Lewis's criminal history as Category I, which the parties do not dispute.   P.S.R. ¶ 55.   Accordingly, based on both the Probation Officer's and the parties' plea agreement, Lewis's advisory Guidelines imprisonment range is 51 to 63 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration of at least 57 months.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Lewis's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, thwarting the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Lewis attacked police officers who were trying to defend the Capitol building from an angry, violent mob.   He contributed to the violence taking place at a location where many officers suffered injuries during conflict resembling a medieval melee.   Officers were struggling to rebuff individuals and groups who were charging up the steps toward them.

Lewis did not just suddenly find himself in the middle of the riot - he chose to join in the fray.   Instead of shying away from the violence, Lewis inserted himself into it.   The crowds on the West Plaza were extensive, dense, and deep with rioters, but Lewis was at the forefront, at the flashpoint of conflict.   He joined many other rioters at that location who were violently assaulting the officers in an effort to get them to yield.   Lewis sprayed officers in four different locations with Wasp and Hornet Killer.   In doing so, he made their job much more difficult.   The effects of this spray incapacitated several officers, forced them to remove themselves from the struggling defensive line, and made them vulnerable to assault by other rioters.

Lewis then took advantage of the breach he helped create and advanced to the Capitol Building itself.   He made his way to the Lower West Terrace, another location where much violence took place.   Using a police baton, he smashed three different panes of a composite window to the right of the Lower West Terrace tunnel.

The nature and circumstances of Lewis's offense were egregious, and fully support the

government's recommended sentence of 57 months.

### B.  The History and Characteristics of the Defendant

Lewis accepted responsibility for his conduct by pleading to an Information and has been compliant with the terms of his bond.

While it is true that William Lewis has only one criminal history point, he was charged with a number of criminal offenses between 1991 and 2011.  P.S.R. ¶¶ 58-62.  Many of these involve theft and/or substance abuse.  It is notable, however, that, in 2011, he was formally charged with one count of Burglary of Habitation (with Intent to Commit Assault) – 2nd Degree Felony.[33]   P.S.R. ¶ 61.  The facts of that case, to which Lewis admitted, involved Lewis throwing a trailer ball through the window of his neighbor's house, kicking open the back door, and threatening to "gut" and kill his neighbor with a box cutter.   Another neighbor intervened and physically restrained Lewis.   At the Capitol building on January 6, Lewis was similarly willing to use violent force and break windows to facilitate entry into a building.

Lewis reported to the Probation Officer that he was enlisted in the U.S. Army from 1986 to 1991.  His discharge was merely "general under honorable conditions", suggesting that it may have been occasioned by uncharged misconduct.  P.S.R. ¶ 105 fn. 3.  Indeed, Lewis had three DUI incidents during one year of his service – one of which resulted in an overturned Jeep.  P.S.R. ¶ 105.  In connection with Lewis's discharge, commanding officers wrote scathing assessments.  They concluded that Lewis had a clear disregard for other people's lives and the safety of others and was not suitable for service in the U.S. Army.   He was barred from re-enlistment.

Lewis' military service renders his conduct on January 6 all the more troubling.   As a former member of the military, he should have been well-aware of the importance of following the law and not entering restricted government buildings.   As a member of the Armed Forces, he swore an oath

---

[33]  It appears that, as part of a plea deal, the charge was *nolle prossed* in 2012.

to *uphold* the Constitution – not undermine it.   His determined efforts to help a violent mob storm a guarded government building which symbolizes our representative democracy are despicable. One would have expected someone with Lewis's military background to have had more regard for the sacred integrity of our democratic institutions.   And yet, Lewis can be seen wearing a jacket with a U.S. Army patch during the riot.

For these reasons, Lewis's military record sheds light on his personal characteristics and weighs in favor of a lengthy sentence of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports the recommended sentence.   Lewis's assaultive conduct on January 6 was the epitome of disrespect for the law.

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.   18 U.S.C.§ 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[34]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a sentence of 57 months of incarceration.

While Lewis has accepted responsibility by pleading guilty to an Information, he has never expressed any remorse.   To the contrary, at the plea hearing, Lewis appeared to have difficulty

---

[34] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

admitting to the Court that he intended to spray any officers.   Any last-minute expressions of remorse should be viewed with skepticism, particularly in light of his recent Objections calling his conduct and even the validity of his conviction into question.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home.   It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day.   It came when he realized that he could go to jail for what he did.   And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).   A defendant is not required to express remorse, but his failure to do so may be an indication that he does not regret what he did and is, therefore, at risk to engage in similar conduct in the future.   A significant sentence is necessary to deter Lewis from engaging in such conduct in the future.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards."   *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines."   *Id.* at 101.

F.    **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."    So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."   *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.   18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."   *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).   The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."   *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).   "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."   *Id*. at 1095.   "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[35]

---

[35] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[36] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentence in the following case provides a suitable comparison to the relevant sentencing considerations in this case.

*United States v. Mitchell Gardner, II,* Case No. 21-cr-622 (APM), featured conduct similar to that of Lewis.   After first encouraging other rioters to drag officers out of the LWT tunnel and to break a window, Gardner decided to take matters into his own hands.   He sprayed police officers in the LWT tunnel using a large, stolen police OC spray cannister.   He continued to deploy the spray until the cannister was depleted.   Then he used the empty cannister to bash the nearby composite window which is to the left of the LWT tunnel entrance.   Once the window was broken, he and other rioters went crawled through it to enter the room on the other side (ST-2M).   From inside, he removed another pane of the window and helped pass items from the room back out through the window so that they could be used as weapons by the mob.   Gardner pled guilty to violations of 18 U.S.C. §§ 1512(c)(2), 231(a)(3), and 111(b).   He received a sentence of 55 months.   Unlike Lewis, however, his Guidelines calculation did not include a 3-level enhancement for bodily injury.

In *United States v. Aiden Bilyard,* Case No. 22-cr-34 (RBW), Bilyard sprayed officers in a defensive line on the LWT using pepper spray gel.   The efforts of Bilyard and other rioters caused

---

overstate the severity of the offense conduct.   *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[36] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES."   The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

the officers to retreat to the LWT tunnel.   Bilyard then turned his attention to the composite window to the left of the tunnel.   From a close distance, he encouraged another rioter, who had a metal tomahawk, to break the window.   He also watched the efforts of Gardner described above.   After being handed a baseball bat, Bilyard smashed out one of the lower panes.   After announcing his accomplishment to the rioters in the vicinity, he crawled into room ST-2M, and many others followed.   Bilyard took pictures and videos while inside.   He took the spray can home as a souvenir.   When interviewed, Bilyard was attending basic training for the United States Air Force. He lied to Agents about the nature and extent of his conduct.   Bilyard pled guilty to a violation of 18 U.S.C. §§ 111(a)(1) & (b).   As in Gardner's case, Bilyard's Guideline calculation did not include the enhancement for bodily injury.   In sentencing Bilyard to just 40 months of incarceration, the Court gave weight to Bilyard's substantial assistance and to his youth (he was 18 years old when he committed the offense) as mitigation.

In *United States v. Daniel Caldwell,* Case No. 21-cr-181 (CKK), Caldwell was present for some time on the West Plaza, where he taunted and verbally challenged officers trying to maintain defensive lines at the top of a short flight of stone steps.   Angry that some officers were deploying OC spray as a means of crowd control, Caldwell deployed multiple streams of his own spray at the officers.   He then ascended to the Upper West Terrace and briefly entered the Capitol building via the Senate Wing Door.   After the riot, in a private interview at a nearby hotel, he admitted having sprayed "15 cops."   A Marine Corps veteran, Caldwell was wearing a camouflage military-style backpack and protective glasses.   Caldwell pled guilty to violations of 18 U.S.C. § 111(a)(1) & (b). He received a sentence of 68 months.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority

to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[37]   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."   *See* 18 U.S.C. § 3663(a)(3).   *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.   The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Lewis must pay $3,761.00 in restitution, an amount which reflects, in part, the role Lewis played in the riot on January 6th as a whole and, in part, the cost of repairing the window.[38]   Plea Agreement ¶ 12.   As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July, 2023. *Id.*   Lewis's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.   P.S.R. ¶ 139.

---

[37]  The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[38]  Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA.   *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.    FINE

Lewis's conviction for a violation of 18 U.S.C. §111(a)(1) subjects him to a statutory maximum fine of $250,000.    *See* 18 U.S.C. § 3571(b)(3).    In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.    *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).    The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.    U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine.    § 5E1.2(a), (e).    The Guidelines fine range here is $15,000 to $150,000 U.S.S.G. § 5E1.2(c).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 57 months of imprisonment, 36 months of supervised release, $3,761 in restitution, a fine, and the mandatory special assessment of $100.

> Respectfully submitted,
>
> MATTHEW M. GRAVES
> UNITED STATES ATTORNEY
>
>
> BY:    ___/s/   David J. Perri_____
> DAVID J. PERRI
> WV Bar No. 9219
> Assistant United States Attorney (Detailed)
> United States Attorney's Office