## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24 CR 215-RC** |
| **WILLIAM LEWIS,** | **Hon. Judge Contreras** |
| **Defendant.** | |

### <u>SENTENCING MEMORANDUM ON BEHALF OF WILLIAM LEWIS</u>

Defendant, William Lewis, by his attorney, Blaire C. Dalton, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, 18 U.S.C. § 3553(a) the Sixth Amendment to the Constitution of the United States, and the Supreme Court's opinion in *Gall v. United States*, 552 U.S. 38 (2007), respectfully submits his sentencing memorandum.

Dated: January 6, 2025                    Respectfully submitted,

                                         /s    *Blaire C. Dalton*


                                         Blaire C. Dalton
                                         DALTON LAW, LLC
                                         53 W. Jackson Blvd., Suite 1523
                                         Chicago, IL 60604
                                         (847) 373-4750

## I.     INTRODUCTION

William Lewis pled guilty to one count of Assaulting a Federal Officer, in violation of 18 U.S.C. § 111(a). He now appears before this Honorable Court prepared to be sentenced for his regrettable conduct on January 6, 2021. Here, his conviction offers only a glimpse into Mr. Lewis' challenging and commendable life. Mr. Lewis has devoted his entire life to helping others. Whether it was enlisting in the army to bravely serve his country during the desert shield/storm initiative, or volunteering to be the primary caretaker for his mother and mother-in-law in their times of need, Mr. Lewis' focus has always been the care of others. Sometimes, to his detriment. Subsequent to his return from Iraq, Mr. Lewis struggled to return to "normal life" and turned to narcotics to escape his demons. Unfortunately, his escape tools turned into an addiction that had dire consequences for several years. While Mr. Lewis got control of his addiction, he continues to suffer from his undiagnosed PTSD. While the lifelong effects of his PTSD likely had a direct impact on his regrettable reactions on January 6th, he is in no way attempting to excuse his conduct.

Numerous letters in support of Mr. Lewis' good character have been submitted by his family and friends. The outpouring of love, admiration, and appreciation expressed in the letters submitted draw light upon his true character. The letters demonstrate how much of an anomaly the current circumstances are in his life. The consistent theme illustrated throughout the letters is that of a man with an exemplary moral character and integrity who has devoted his life to his

2

country, his family, his church, and his community.

Sentencing a criminal defendant is one of the trial court's most important yet difficult tasks. Determining the appropriate sentence "requires a court to consider with great care and sensitivity, a large complex of facts, and factors." *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012). The Supreme Court has stated that "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 131 S. Ct. 1229, 1239-40 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

It is essential that a court's sentencing decision be informed and guided by the fundamental doctrines of mercy and compassion. *See United States v. Blarek*, 7 F. Supp. 2d 192, 210 (E.D.N.Y. 1998). While these principles are not specifically delineated as rationales for sentencing, they are evidenced by the federal sentencing statute's mandate that the court impose the lowest possible punishment to accomplish the goals of sentencing. *Id.*; 18 U.S.C. § 3553(a) (the court shall impose a sentence that is sufficient, but not greater than necessary to comply with the purposes of sentencing). As the Second Circuit recently explained:

> Sentencing, that is to say punishment, is perhaps the most difficult tasks of a trial court judge." Jack B. Weinstein, *Does Religion Have a Role in Criminal Sentencing?*, 23 Touro L. Rev. 539 (2007). While there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of "the diverse frailties of humankind." *See Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (plurality opinion). In deciding what sentence will be "sufficient, but not greater than necessary" to further the goals of punishment, 18 U.S.C.

§3553(a), a sentencing judge must have a "generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." Guido Calabresi, *What Makes a Judge Great: To A. Leon Higginbotham, Jr.*, 142 U. Pa. L. Rev. 513 (1993); *see also* Edward J. Devitt, *Ten Commandments for the New Judge*, 65 A.B.A. J. 574 (1979) ("Be kind. If we judges could possess but one attribute, it should be a kind and understanding heart. The bench is no place for cruel or callous people regardless of their other qualities and abilities. There is no burden more onerous than imposing sentence in criminal cases").

*United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017).

In this case, a sentence within the Guidelines range is "greater than necessary" to accomplish the goals of sentencing. Mr. Lewis respectfully asks the Court to impose a sentence far below the low-end of the Guidelines range, along with any other conditions the Court deems necessary, fair, and just under the circumstances. Such a sentence reflects the seriousness of the offense, while, at the same time, considers Mr. Lewis' otherwise good character, his history of service to his country, and the very real collateral consequences that follow his conviction.

## II.    WILLIAM LEWIS' PERSONAL HISTORY AND CHARACTERISTICS

To understand the person before the Court, one must appreciate William ("Billy") Lewis' whole life. Like many people, over the last 58 years, his life has gone through many stages. Putting emphasis of his actions on January 6, 2021, would paint an incomplete and inaccurate portrait of a complex man who has survived unimaginable environments, fought to overcome psychological stressors, and has come out the other side a better man.

Billy's life has always been centered around two things: family and loyalty. Some would say Billy was "raised right", but all that really means is that he had

two parents who loved him and gave him the best childhood they could. From an early age, Billy learned about responsibility and faith. He spent many days learning value-based leadership training through the cub scouts and attended church every Sunday with his family. His father was a decorated veteran of the Marine Corps, an accolade Billy very much wanted to replicate.



Image 1:     Photograph of William Lewis, Sr. Marine Corps

In 1986, shortly after graduating high school, Billy proudly enlisted in the United States Army. Initially, he had enlisted to serve for four (4) years. In that time, he climbed the rankings to Sergeant and was responsible for the lives of 15 soldiers. Just as he was about to complete his service, the Desert Shield/Storm initiative was beginning in the Middle East. Never one to abandon his service "family", Billy reenlisted for another two years so that he could serve beside the soldiers he had trained. It was during his combat overseas that something changed within Billy. He witnessed mass killings, severe abuse, and at times, torture. That

being said, he was and continues to be proud to have served this Country. He is honored to say that he returned from Desert Shield/Storm with great success and zero casualties.



Image 2:    Billy in Iraq with his squad, expecting a chemical attack (SCUD missiles), in chemical gear.



Image 3:     Billy outside of his base



Image 4:     Billy in specialist rank



Image 5:    Billy in his rank as Sergeant



Image 6:    After SCUD missile landed near base. Billy in preparation for chemical weapons.



Image 7:    Flying into Iraq to Sling load equipment. Oil wells on fire[1].

When Billy returned from Desert Storm, he began experiencing trauma related symptoms consistent with PTSD. He was too proud to ask for help. Indeed, at that time, asking for help was looked at as a sign of weakness. Instead, he turned to the all-too-common escape mechanism - alcohol. In the months of free time while the soldiers were waiting for their equipment from overseas, Billy received a DUI. He was honorably discharged just a few months short of his expected date.

Recognizing that he had a problem, Billy devoted his time and energy to obtaining an education and working to achieve his next goal, becoming a fireman. He attended Austin Community College in 1992 and a few years later, Billy

---

[1] Additional photographs and certificates from Mr. Lewis' service are attached hereto as Exhibit A.

received an Emergency Medical Technician (EMT) certificate from the Texas Department of Health and a Basic Fire Fighter certificate from the Harker Heights Fire Fighter Training Academy. See Exhibit B. Billy completed his training as a distinguished honorary graduate of the EMT academy.

As the years went by, Billy continued to privately battle the demons of addiction and PTSD. The manifestation of these psychological issues coupled with having to file for bankruptcy in 2006 led Billy down a dark path that he almost did not survive. In 2007, he completed a court ordered intensive outpatient treatment program. Billy has long ago come to grips with the fact that his run-ins with law enforcement were the result of his drug use and abuse. That acknowledgement is what has allowed him to move on from those days and better his life by focusing on positive activities that help his family and his community. Billy, therefore, is a prime example of a man who had the ability to change his life after a judge chose rehabilitation over incarceration.

In 2012, Billy unexpectedly lost his father to Pneumonia. Nearly immediately following his untimely death, Billy moved from Texas back to Burbank, Illinois to take care of his mother and ensure she was able to remain in the home she and her husband had started their family in. His mother, now 85 years old, submitted a heartfelt character letter in which she credits Billy's selflessness for the reason she has been able to stay in her beloved home. See Exhibit C, Character Letters. Indeed, throughout every character letter submitted on his behalf, Billy's friends and family echo the same sentiment: Billy has a kind and generous heart and is

always first to help others before himself. *Id*.

For over a decade now, Billy has been doing remarkably well. When he returned home, consistent with his character, Billy devoted much of his time to his family church. As the Bast family recalls, Billy came to church "proudly dressed in his Army uniform" ready to serve. See Exhibit C. Initially he volunteered to be the Church greeter. Eventually, Billy was asked to assist with the Youth Ministry at the church. For years, he guided the junior high and high school children. He was their "role model" and helped to "shape and mold their love for Christ." See Linda Bast Character Letter. As Kyle Isabelli, the Senior Pastor at Avenue Christian Church, observed, "Jesus' love" was flowing out of Billy's heart, "imparting on the kids" at the church. See Exhibit C.

Billy's decision to return home had a positive rippling effect throughout his community and the lives of so many. Including that of his now wife, Deanna Korbel Lewis. The two met shortly after Billy returned to Burbank. They quickly forged an unbreakable bond as the two were both caring for their widowed mothers. Deanna was embroiled in a contentious, expensive, lengthy custody case with the father of her daughter, Megan. As Deanna describes it, Billy "took her under his wing" and "helped pull her out of severe depression". See Exhibit C. Falling in love with Deanna also meant that Billy would finally become a father figure to her (then) 10-year-old daughter. As time passed, Billy became "more of a father figure" to Megan than her biological father had been. *Id*. Billy has flourished in his role as Megan's bonus dad. Helping to raise her has been one of the most rewarding things he has

11

done with his life. With his guidance, and in the wake of her controlling father, Megan has become a strong and independent young woman. In her letter to the Court, Megan details how it was Billy who encouraged her to "summon up the courage" to pack her bags and move away from her toxic father. This was undoubtedly one of the most difficult things for Billy to do as it meant that his "daughter" would be moving away from him as well. But Billy has never been one to put himself or his needs before others. At the end of 2021, Billy asked Megan for her help in picking out an engagement ring for Deanna and, a year later, Billy and Deanna were finally married. *Id*.



Image 8:     Billy and his "daughter" Megan



Image 9:       Billy and Deanna at their September 2022 wedding

Billy spends a majority of his free time not only caring for his own mother, but now also caring for Deanna's mother. In 2019, rather than forging a new start for he and Deanna, Billy purchased his first home within blocks of his mother and mother-in-law homes. He spent the next few years rehabbing the home, focusing first on his daughter's bedroom so that she would have a safe place to stay. See Megan's Letter, Exhibit C. There is not anything Billy cannot fix. Mechanical, electric, plumbing, carpentry, he is a jack of all trades. For the last 25 years, he has dedicated his talents to the home improvement industry. He is self-employed and barely makes enough to get by. This is likely due to the fact that Billy tends to generously offer his skillset to friends and family alike, free of charge. See Linda Bast letter, Exhibit C. As it stands, Billy is the only person willing and able to care for all three homes: his home with Deanna, his mother's home, and his mother-in-

13

law's home.

Billy is the quintessential family man[2]. Recently, despite being newlyweds, he happily welcomed his 22-year-old nephew, Ryan, to live with him and his new wife. He would never abandon his loved ones and is devoted to taking care of his 85-year-old mother(s). Now in the face of sentencing, Billy is terrified of what his absence might mean to them. Both his mother and mother-in-law wrote letters to the Court explaining how essential Billy is to their lives and how, without him, neither is sure how they will survive.

> I rely on him as my sole caretaker. He handles repairs, finance/taxes, medical situations, doctor things, everything. He is an absolute blessing to me and I ask for your mercy to keep him near me and allow him to continue helping me, as I am running out of time. I do not want to die without my son and I am terrified that a lengthy prison sentence will mean just that.
>
> Loretta Lewis Letter, Exhibit C.
>
> Billy has been my life saver and my knight in shining armor. In my eyes, he is my hero. He comes to my house and fixes anything that needs to be fixed. Billy has made it his plan to help take care of me so I'm able to live out my life in my marriage home. If he is not here, I will not have anyone to help me do these things that my daughter cannot do. I worry that if Billy goes to jail, I may lose my home or even worse dying.
>
> Esther Korbel Letter, Exhibit C.

---

[2] Additional photos of Billy with his family are attached hereto as Exhibit D.



Image 10:    Billy with his new wife, his mother, and his mother-in-law



Image 11:    Billy and his mom

Billy is ashamed of his actions on January 6, 2021. There is nothing he

regrets more in his life than losing his temper at that rally. Living with regret has taken a toll on his mental health. As his wife explains, Billy is now a "shell of a man." See Exhibit C. "He struggles daily with depression and how he can make amends for his actions." *Id.* Multiple letters detail how Billy struggles to even discuss the events of that day, that doing so brings him to tears. See Deanna Lewis letter, Esther Korbel letter, Megan Szkirpan letter, Dawn Mitchell letter. He has expressed his sincere remorse to all lucky enough to be considered his family.

A.  Evidence of Acceptance of Responsibility, Remorse and Rehabilitation

Statistics show that straight prison sentences do not promote rehabilitation. Moreover, the cost of incarceration is seven times higher than the cost of supervision by probation officers.[3] There can be little doubt that there is a cost-benefit value associated with rehabilitation programs aimed at lowering recidivism rates.[4]

Indeed, one of the goals of sentencing is rehabilitation, *see, e.g., United States v. Grayson*, 438 U.S. 41, 45-48, 98 S.Ct. 2610, 2613-14, 57 L.Ed.2d 582 (1978); *Williams v. New York*, 337 U.S. 241, 247-48, 69 S.Ct. 1079, 1083-84, 93 L.Ed. 1337 (1949), and a defendant's admission of responsibility or expression of contrition "is often a significant first step towards his rehabilitation and, for that reason, deserving of a possible reward in the form of a lessened sentence," *Smith v.*

---

[3] *See* Mathew Rowland, Deputy Assistant Director of Administrative Services letter of May 6, 2008 at www.nynd-fpd.org/sentencing/cost%20of%20incarceration%20and%20supervision%202007.pdf

[4] *See* www.ussc.gov/publicat/Recidivism_General.pdf. at 15-16.

*Wainwright*, 664 F.2d 1194, 1196 (11th Cir.1981). Admission of guilt thus may properly be taken into account in determining what sentence is needed to achieve rehabilitation. *See Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

Section 3553(a)(2)(D) requires the judge to consider "the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Today, there is substantial evidence that prison, by disrupting employment, reducing prospects of future employment, weakening family ties, and exposing less serious offenders to more serious offenders, leads to increased recidivism, and that community treatment programs are more effective in reducing recidivism than prison treatment programs. See Lynne M. Vieraitis, Tomaslav V. Kovandzic, Thomas B. Marvel, *The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002*, 6 Criminology & Public Policy 589 (2007). Statistics further suggest that the rate of recidivism is less for offenders who receive treatment while in prison or jail, and still less for those treated outside of a prison setting. *See* Lisa Rosenblum, *Mandating Effective Treatment for Drug Offenders*, 53 Hastings L.J. 1217, 1220 (2002); *see also* Doug McVay, Vincent Schiraldi, & Jason Ziedenberg, *Treatment or Incarceration: National and State Findings on the Efficacy of Cost Savings of Treatment Versus Imprisonment* (March 2004), Justice Policy Institute Policy Report ("Treatment is a much less expensive option than incarceration for handling substance abusing offenders … Dollar for dollar,

treatment reduces the societal costs of substance abuse more effectively than incarceration does."). *Id.* at 5-6.

Billy has struggled to understand the person depicted in the photographs and videos submitted by the government in this case. One thing is clear, his years of service, preparing for chemical warfare, witnessing the release of airborne chemicals, triggered something within him at that rally when he got sprayed. Studies have shown that symptoms of hyperarousal are severe in Desert storm veterans.[5] Rather than ignore the switch that went off within him that day, shortly after returning from D.C., Billy took it upon himself to enroll in anger management counseling. PSR ¶84-85. He attended seven individual sessions, two hours each. *Id*. In an April 1, 2022 letter, Leanne Machowitch at Anger Management Services opined: "while [Billy] is not an angry person, he has some past and residual anger issues and seemingly negative behavioral responses that he would personally like to address." *Id*. Billy's immediate, voluntary decision to address the underlying causes for his conduct on January 6th not only depicts his acceptance of responsibility for his conduct, but also exhibits an individual who is sincerely remorseful and open and capable of rehabilitation.

While he has admittedly struggled to acknowledge that he intended to hurt law enforcement officers that day, he has always shown an ability to accept responsibility for his conduct. In early 2021, through counsel, Billy reached out to

---

[5] Trauma-related symptoms in veterans of Operation Desert Storm: a preliminary report, Am J Psychiatry (1995) National Library of Medicine. https://pubmed.ncbi.nlm.nih.gov/8379558/ (last visited January 5, 2025).

the United State's Attorney's Office in the Northern District of Illinois in an effort to surrender himself. Despite his desire to turn himself in, years later he was subjected to a surprise arrest warrant. Even in light of that, Billy agreed to speak with agents about what he could remember from that day. Even as recently as a few months ago, Billy has been cooperative with agents and provided additional information regarding the events of January 6th, 2021.

      B. <u>Significant history of compliance with court-ordered release conditions</u>

Billy's potential for rehabilitation is evidenced by his exceptional conduct over the last four years. Over almost half a decade, Billy has shown himself to be a trustworthy, reliable, and hard-working citizen. He has been in full compliance with his conditions of release, without a single issue. Not only because he is required to do so, but because that is who he is at his very core. He has not violated a single condition of his release in the last 425 days. He has not violated the law over the last four years. Furthermore, Billy's 2007 conditions of supervision were completed successfully and his case was dismissed. Respectfully, his history of complying with court-ordered release conditions heavily weighs against the need for lengthy incarceration in this circumstance.

## III.    NATURE AND CIRCUMSTANCES OF THE OFFENSE

In the days leading up to January 6th, Mr. Lewis traveled with a couple of his friends to D.C.. The sole intent being to attend the "stop the steal" rally. Due to his self-inflicted sources of news, Mr. Lewis believed that something nefarious had occurred in the 2020 presidential election. The day before the rally, Mr. Lewis

stopped at Wal-Mart. There he purchased a backpack, water, and beef jerky. He did

not pre-purchase any riot gear, wasp spray, or weapons in a plan to attack the

police. He did not intend to engage in any violence, he was simply there to protest

what he believed to be a stolen election.

Men like Mr. Lewis were not only pawns of the Trump campaign, but more

organized groups on January 6, 2021, like the Proud Boys, who also intended to rile

up normal people in the crowd to serve their agenda. The New York Times

investigated this dynamic and learned that there were different groups who went to

the Capitol building, ones that simply intended to protest peacefully and others

with a plan to incite the crowd and breach the building.[6] The Proud Boys called

people like Mr. Lewis "normies" and had an intent to rile them up in order to

support their agenda.[7]

Within the crowd that day there were people who had planned to and wanted

to do harm. Mr. Lewis was not one of them. He was not a part of any premeditated

organized group and did not post harmful content on social media. He did not come

prepared for a confrontation He had no gas mask, pepper spray, or weapon of any

kind.

As directed by former President Trump, Mr. Lewis followed the crowd

---

[6] New York Times, Proud Boys Led Major Breaches on Jan. 6 Video, July 11, 2022, available at
https://www.nytimes.com/2022/07/12/us/politics/proud-boys-jan-6.html (last viewed on December 22,
2024).

[7] Reneau, Natalie, New York Times, How the Proud Boys Breached the Capitol on Jan. 6: Rile up the
Normies, June 17, 2022, available at
https://www.nytimes.com/video/us/politics/100000008392796/rile-up-the-normies-howproud-boys-
breached-the-capitol.html

towards the Capitol. Circumstances quickly got out of control. As the government

acknowledges, law enforcement was forced to use a variety of crowd control tactics,

including spraying chemical irritants, to try to contain and repel the rioters. See

United States v. Steven Miles, 22 CR 136, Dkt. No. 63, p. 8. From his position,

around 30 feet from the front lines, Mr. Lewis was hit with an excessive amount of

pepper spray. Sadly, this experience caused a negative psychological response in

Mr. Lewis. He was transported back to the trauma he endured during his military

training when he was forced to be sprayed with pepper spray for long periods of

time. A gentleman, who appeared to be a medic, helped Mr. Lewis by pouring water

into his eyes. Mr. Lewis continued to be pushed and pulled by the swell of the crowd

and began to lose his temper. From the ground, Mr. Lewis picked up a cannister

containing wasp spray, pointed the cannister up into the air, and the photographic

and video footage revealed what occurred next.

   A short time later, Mr. Lewis found himself near one of the windows of the

capital. At that point, Mr. Lewis was struck in the eye with a large object, possibly a

baton. Mr. Lewis was badly injured[8] and, per his training and likely a symptom of

his PTSD, Mr. Lewis went into defensive combat mode. He observed another man

hitting the windows with a flagpole[9] and he, almost instinctively, grabbed a baton

---

[8] As a result of this injury, Mr. Lewis received retinal surgery at OSF Healthcare on
March 2, 2021. See PSR ¶¶79, 80.

[9] See Gov. Memorandum, Dkt. No. 40, p 30, Image 33.

from the ground[10] and began hitting the windows as well. It was not until another man behind him yelled, "what are you doing? This is not who we are", that Mr. Lewis snapped back into consciousness. It was at that moment that he finally "came to" and understood what he had done. Mr. Lewis never entered the Capitol building that day, and instead, traveled back through the crowd and away from the chaos that followed.

Mr. Lewis does not recognize the man in the photographs and videos. Indeed, the videos of the spray incidents appear to reflect Mr. Lewis in a disassociated state. Blank stares. He respects law enforcement and would never want to bring harm to the brave men and women who serve to protect. He has had a very difficult time coming to terms with the fact that he did, indeed, cause harm. This was an out-of-body experience and, until he was shown videos by counsel, he could not comprehend that he had sprayed the officers.

Mr. Lewis accepts complete responsibility for his actions. He has pleaded guilty because he is guilty. He unlawfully reacted to events that unfolded around him. He knows he should not have been on the Capitol grounds and the events that unfolded are entirely a situation of his own making. Mr. Lewis is deeply remorseful for his conduct and offers his sincere apologies to the law enforcement officers that were affected by his decisions that day and will state as such during his allocution. In fact, shortly after returning from the rally, Mr. Lewis sought the help of an anger management counselor to address the emotions and reactions that he experienced

---

[10] Mr. Lewis did not steal an officer's baton.

that day.

## IV.    OTHER 3553(A) SENTENCING FACTORS

### A.  The Need to Avoid Unwarranted Sentencing Disparities

Understanding that no case is alike, an overview of similarly situated January 6th defendants charged with 18 U.S.C. §111(a), by itself or in addition to other counts, is an important consideration in an attempt to avoid unwarranted sentencing disparities. 18 U.S.C. §3553(a)(6). Compared to the following similarly situated defendants, a sentence well below the low-end of the guidelines would be appropriate in this case.

In *United States v. Leffingwell*, 21 CR 5-ABJ, Mr. Leffingwell pled guilty to assaulting, resisting or impeding a Federal Officer pursuant to §111(a)(1). 21 CR 5-ABJ, Dkt. No. 25. Mr. Leffingwell entered the Capitol building. *Id*. at Dkt. No. 31. When the officers pressed the crowd back, Mr. Leffingwell punched one officer in the head, then punched another officer in the head, and then punched the first officer again. Due to the fact that Mr. Leffingwell's fists were not considered a dangerous weapon, his guidelines range was 24-30 months imprisonment. He was sentenced to six months incarceration. *Id*. at Dkt. No. 51. It seems unjust that a man that engaged in hand-to-hand combat with two different officers should receive a lower sentence than a man that sprayed wasp spray, from a distance, in the direction of the officers.

In United States v. James McNamera, 23 CR 119-ABJ, the defendant pled guilty to one count of §111(a). Mr. McNamera swung at a capitol officer and swung

a bike railing at the doors of the Capitol building. His guidelines range was 24-30 months imprisonment. He was sentenced to one year of incarceration.

In United States v. Michael Foy, 21 CR 108-TSC, the defendant pled guilty to one count of §111(a)(1) and one count of §1512(c)(2). For those two counts, Mr. Foy's combined base offense level was 31. See *Id.*, at Dkt. No. 92. Defendant Foy's conduct consisted of hurling a sharpened metal pole at officers, using a hockey stick to repeatedly strike officers in the face, head, neck and torso, and then entering the capital building. *Id.* Due to his offense level, Mr. Foy's guidelines range was 78-97 months' imprisonment. *Id.* He was sentenced to 40 months' imprisonment. *Id.* at Dkt. No. 101.

Consider United States v. Creek, 21 CR 645-DLF, where the defendant went to the rally armed with mace and a knife. Defendant Creek pushed through the front line of the barrier, grabbed an MPD officer and drove him forcefully back, thereafter hitting him in the face shield. He then ran towards a USCP officer and proceeded to shove and kick him, causing him to fall backward to the ground. Despite this hand-to-hand combat and premeditated purchase of combat equipment, Creek was sentenced to 27 months' imprisonment.

Consider United States v. Nicholas Brockhoff, 21 CR 524-CKK, where the defendant pled guilty to §111(a)(1), and (b). Defendant Brockhoff threw items at police, assaulted multiple officers in different locations by spraying them with a fire extinguisher, stole a police officer's helmet, entered the Capitol, and kicked open a locked senate conference room. *Id.* at 55. His guidelines range was 47-56 months'

imprisonment. *Id*. at 57. He was sentenced to 36 months' imprisonment. *Id*. at 58.

Consider United States v. Matthew Miller, 21 CR 75-RDM, where Defendant Miller pled guilty to one count of §111(a)(1) and one count of §1512(c)(2). Miller acknowledged that he encouraged others to breach the Capitol, threw a full beer can at law enforcement, threw batteries at law enforcement, and sprayed the contents of a fire extinguisher at law enforcement. See *Id*. at 67. While Miller's conduct was arguably worse than Mr. Lewis', with the same criminal history category, his guideline range was 41-51 months' imprisonment. *Id*. Ultimately, he was sentenced to 33 months imprisonment. *Id*. at Dkt. No. 74.

In United States v. Thomas Hamner, 21 CR 689-ABJ, Mr. Hamner pled guilty to one count of 18 U.S.C. §111(b), 2, a more serious offense than that of Mr. Lewis'. His conduct consisted of being one of the first to breach the C"apitol grounds, where he proceeded to tear down fences, and ram a large metal "TRUMP" billboard towards the police officers. *Id*. at Dkt. No. 28. Defendant Hamner came prepared with riot gear. *Id*. Defendant Hamner had a criminal history category III. *Id*. According to the government, Mr. Hamner's guidelines range was 70-87 months' imprisonment. *Id*. He was sentenced to 30 months' imprisonment.

In United States v. Jason Farris, 23 CR 68-AMJ, the defendant pled guilty to one count of §111(a)(1). Defendant Farris' conduct consisted of shoving a U.S. Capitol Police Officer, knocking him to the ground. *Id*. at Dkt. No. 32. Defendant Farris also climbed onto a mechanical window-washing machine attached to the front of the Capitol building and operated it so that it rose up several stories. *Id*. He

then used the end of a flagpole to strike a glass window of the Capitol. *Id*. Farris then illegally entered the Capitol building. *Id*. Because Defendant Farris' conduct of shoving an officer did not involve a "dangerous weapon" and did not ultimately injure the officer, his base offense level was 17 with a guidelines range of 24 to 30 months' imprisonment. *Id*. He was sentenced to 18 months' imprisonment. *Id*. at Dkt. No. 36.

In United States v. Steven Miles, 22 CR 136-MJC, Mr. Miles pled guilty to §111(a)(1). Defendant Miles was part of the Proud Boys and entered restricted grounds even before the "stop the steal" rally was over. *Id*. at Dkt. No. 63. He stormed the police line, where he shoved and tried to punch officers. *Id*. He used a wooden plank to smash the windows of the Capitol, creating one of the first breaches, and then entered the Capitol. *Id*. With a guidelines range of 24 to 30 months, he was sentenced to 24 months' incarceration.

The government cites to three January 6th cases arguing that those cases offer suitable comparisons to the relevant sentencing considerations in this case. Dkt. No. 40, p. 42. Those cases are readily distinguishable from Mr. Lewis' conduct as each defendant participated in **direct** violent contact with law enforcement or encouraged the same.

The defendant in United States v. Mitchell Gardner, 21 CR 622, pled guilty to civil disorder §231(a)(3), obstruction of an official proceeding §1512(c)(2), and assaulting officers using a dangerous weapon §111(a)(1) and (b). Gardner encouraged rioters to assault the police by saying "grab them and pull them out" –

all of which is on video. *Id.* at 57. He then stole an industrial size OC spray from law enforcement and sprayed and emptied the entire cannister directly at the officers who were stuck within the confines of a tunnel[11]. *Id.* Gardner then broke through a window of the Capitol, crawled through, and directed other rioters to enter. *Id.* Furthermore, inside the Capitol, Gardner began handing broken pieces of furniture to other rioters which were ultimately used against law enforcement. *Id.* Once he exited the Capitol, he spent the next hours encouraging and cheering on others as they assaulted officers and continued to engage the officers as well. *Id.* What separates this case even further from Mr. Lewis', is that the government sought a two-level upward departure because the defendant's offense involved a federal crime of terrorism, pursuant to U.S.S.G. §3A1.4. *Id.*

Mr. Lewis' conduct unquestionably interfered with law enforcement, was reckless, and requires punishment. But in one fundamental sense, the act of utilizing wasp spray recovered from the ground, a spray that is meant for the smallest of insects, is not akin to shooting at officers, throwing bricks at them,

---

[11] It is important to note that there are distinct differences between the effects of OC (pepper) spray (as used in these and other January 6th cases) and wasp spray (as used by Mr. Lewis) on the human eyes. Pepper spray is specifically designed for use on humans, targeting the eyes and respiratory system, causing involuntary eye closure, swelling, and other incapacitation effects. The active ingredients in wasp spray are only minimally irritating to human eyes, making it insufficient for stopping a goal oriented attacker. See Sabre: Why Wasp Spray for Self-Defense Against Humans Won't Work: A chemist Explains (7/12/2021) https://www.sabrered.com/blog/why-wasp-spray-self-defense-against-humans-wont-work-chemist-explains#:~:text=The%20active%20ingredients%20in%20wasp%20spray%20are,eye%20closure%2C%20swelling%2C%20and%20other%20incapacitating%20effects. (last visited January 6, 2025).

punching them or striking them with poles or fists. In all the latter cases, the criminal acts admit of no intent except to inflict bodily injury. Mr. Lewis' acts here were wrong, however, a bit more equivocal. Given that the spray was generally directed in an upward arcing direction, one cannot simply presume Mr. Lewis intended to physically injure the officers—as opposed to interfering with them. Indeed, unlike so many other rioters and defendants, Mr. Lewis' contact with law enforcement was indirect. Whereas shoving, punching and kicking a person is quintessential assaultive conduct. Arguably, there is a significant difference and should be considered in mitigation.

### B. Specific and General Deterrence

Section 3553(a)(2)(B) requires the judge to consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct." Deterrence is generally divided into two subcategories: (1) specific and (2) general. Specific deterrence to deter Mr. Lewis from personally committing another crime and general deterrence to send a message to the community at large. In this case, a lengthy period of incarceration would have no significant specific or general deterrent effect.

There is no evidence that increases in sentence length reduce crime through general deterrence. Current empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents,

reached that conclusion, as has every major survey of the evidence." *Michael Tonry,*
*Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research
28-29 (2006). Another problem with justifying punishment as a means to deter
others, besides its ineffectiveness, is that it is immoral to punish one person merely
to promote deterrence of others. "Judicial punishment can never be administered
merely as a means for promoting another good either with regard to the criminal
himself or to civil society but must in all cases be imposed only because the
individual on whom it is inflicted has committed a crime. For one man ought never
be dealt with merely as a means subservient to the purpose of another." Immanuel
Kant, The Science of Right 195 (W. Hastie trans., 1790).

For all of the reasons articulated in the letters of support and the shame Mr.
Lewis feels for his actions on January 6th, he is not likely to re-offend. He does not
carry with him any resentment or hate for anyone, other than the disdain he has
towards himself for engaging the way he did. At his core, he is not a violent man.
He was triggered in a way that he had not experienced since returning from the
middle east. It is not an excuse, but it is certainly an explanation for why he acted
in a way that was so antithetical to his true character. He has accepted that he has
underlying, deep-ridden issues stemming from his service and he is working to
better himself so that he is armed with healthy coping mechanisms in the future.
The Court need not sentence him to a period of incarceration for the purpose of
deterring him from committing other offenses.

Moreover, for someone like Mr. Lewis, who has never been incarcerated for

longer than 6 months, he is at the lowest risk of recidivating. Research has

established that the risk of recidivism is lowest for offenders with the least

experience in the criminal justice system. United States Sentencing Commission,

*Recidivism and the "First Offender"*, May 2004, p. 17.[12] "Offenders with zero

criminal history points have lower recidivism rates – less than 6% - than offenders

with one or more criminal history points. Even among offenders with zero criminal

history points, offenders who have never been arrested have the lowest recidivism

risk of all.

In light of Mr. Lewis' background, employment, his strong family ties, his

voluntary commitment to address his mental health and psychological issues, and

his conduct on bond, this Court can confidently conclude that he will lead a law-

abiding life from this point forward.

### C.  JUST PUNISHMENT AND KINDS OF SENTENCES AVAILABLE

The Court may consider that the decisions that led Mr. Lewis to stand before

this Court have consequences far beyond a felony conviction and likely prison

sentence. Because of the high-profile nature of this case, Mr. Lewis now bears the

scarlet letter of an "insurrectionist." He has only himself to blame, however, many

of his close friends have abandoned him for fear of their own character

assassination. His reputation is forever tarnished, and his face will forever be

plastered across the internet. He has been placed on a red-flag terrorist watchlist by

the TSA, which recently resulted in an extremely intrusive and lengthy screening

---

[12] *Available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf

before flying. Moreover, where he would generally be eligible for a zero-point offender adjustment under U.S.S.G. §4C1.1(a), because Mr. Lewis' conduct involved indirect contact with law enforcement officers via wasp spray, he is not eligible for this reduction.

Under the statutory provisions, Mr. Lewis is eligible for no less than 1 no more than 5 years' probation. PSR, ¶128. As a condition of probation, a fine, restitution, or community service must be imposed. As part of his plea agreement, Mr. Lewis agreed to pay restitution in the amount of $3,761. This amount includes the $2,000/defendant that the government has imposed on a majority of the January 6th cases, along with an additional $1,761 for the windowpanes that Mr. Lewis was responsible for damaging. Even though Mr. Lewis was not the sole individual responsible for damaging or breaking these three panes (see above), he has taken responsibility for the entirety of the damage via his restitution amount.

Given Mr. Lewis' history and characteristics, the nature and circumstances of the offense, the collateral consequences of his conviction, the need to avoid unwarranted sentencing disparities, and his low risk of recidivism, a sentence far below the low-end of the Guidelines range would be just punishment in this case.

## CONCLUSION

William Lewis failed himself and his country four years ago, to this date. While it is a date that will live in infamy for the United States of America, the same is true for Mr. Lewis' life. It was a day that he became someone he did not recognize for a cause that he had been misled to believe. Each defendant is unique and the

Court must consider Mr. Lewis' personal conduct and the history and circumstances that led to it. The Court must also consider our justice system's sentencing scheme and purpose when determining a fitting punishment. Within that scheme is rehabilitation and the risk of recidivism. Which is why a district court is empowered with significant discretion when determining an appropriate punishment. Mr. Lewis respectfully requests this Court to consider a sentence considerably below the low-end of the Guidelines, along with any other conditions the Court deems necessary, fair and just. Such a sentence would be appropriate when balancing the nature and circumstances of the offense against Billy's history, characteristics, acceptance of responsibility, sincere remorse, and the collateral consequences of his conviction. Such a sentence is sufficient but not greater than necessary, to comply with the purposes of sentencing articulated in 18 U.S.C. §3553(a).

Dated: January 6, 2025                         Respectfully submitted,

                                               /s     *Blaire C. Dalton*

                                               Blaire C. Dalton
                                               DALTON LAW, LLC
                                               53 W. Jackson Blvd., Suite 1523
                                               Chicago, IL 60604
                                               (847) 373-4750